Mr. Largess, when you're ready. Thank you. May it please the court. This is Luke Largess on behalf of Michael Jones. This is a classic pretext case, and the court below made two fundamental errors. One, fully crediting Lowe's disengagement claims and evidence as justification for the termination. And second, finding that the evidence of dishonesty in this assessment process was immaterial and could not be considered by a jury. Let me take you through each of those quickly. First, the problem with the disengagement evidence, the jury could readily disregard or reject it and disbelieve it. The timing is the first problem. The court focuses mainly on these alleged confrontational discussions about severance and cleaning out the office back in April and May. But the termination is the last days of October. There's no real connection between those discussions and what happens. And there's no evidence supporting disengagement in that time, except the following. Objective perceptions that he was not checking in and not participating enough, with no record of any complaint. Claimed that his hours were reduced, but we produced calendars showing that, in fact, that was completely not true, that his hours remained the same, his schedule remained as busy as ever. And then finally, the only objective complaint was the need to call or email him to ask why he was not on the agenda for a single meeting in five months. The jury could readily decide in this case that Mr. Jones, who in his prima facie case here, is extraordinary. A black man, the first black man to have any significant management authority at Lowe's, leads the company through a dramatic transformation of its fortunes. Bringing in new talent and new methods that has results that he is acclaimed for both inside and outside the company. A jury could find that he continued to act in that same manner from May until his termination. And there's record evidence of examples of him doing that. The third problem, which relates to the sort of second piece here, is that there is evidence of dishonesty. And the jury could assess this disengagement claim with circumspection at the way this assessment process was handled. Let me begin with a couple aspects about the assessment. The first is the court's simply wrong to sort of say there's disputed evidence about whether this was a CEO assessment or some broader executive development effort. In fact, if you look at page 2624 of the record, you'll find the August 2015 single page CEO succession plan that was presented to Lowe's board by Ms. Asura, who was then the HR person. If you look at page 2794, you'll find the testimony of the board member, Morgan, who said the board decided to bring in an outside consultant to do a in-depth study of these two men and what their skills were to decide who should be the internal successor. And that resulted in objective testing, psychological testing, and surveys of other employees. And if you look at compare page 733 of the record to page 2300, and especially page 1120 of the record to page 2370, you see these graphs and measures that show that Mr. Jones was superior to Mr. Malzberger clearly in this process. But then you have this subjective assessment about the competencies that, ironically, and this is at page 734 from Mr. Jones and 2302 from Mr. Malzberger. But Mr. Nedlock admits at page 149 and 150 of the record that he never believed these results. But it's undisputed that for the month of May, he and Ms. Weber scrivened away at the CEO profile. Look at page 750, 1442, and 1153. Let me ask you one thing, Mr. Larges. Is it undisputed that he was asking for a $9 million severance package prior to his termination? Not prior to his termination, Your Honor. That was in the negotiations afterward. And actually, I think that that is actually evidence of discrimination in this case for this reason. The proxy statements that are in the record show that he had more than $9 million in stock options issued to him while he was leading the resurgence of this company. Just in 2015 and 16, he was owed that. But because he was fired, he lost the money. When did he request the severance package? Well, you might be confusing two issues. Back in April and May, when he was presented with, after they spent the month of May trying to rewrite this profile to make these competencies the linchpin of who should be the CEO successor, and he balked at the validity of it, and Niblack agrees that it was invalid. He then said, rather than fire me, and his testimony is, if you look at page 261 of the record, that Ms. Weber met with him and told him he had to word for word repeat that he couldn't do those three things. That's what they wanted him to do. And he balked at doing that, and he said, if you're going to fire me, if you don't want me here, let's just work out a severance. They had that discussion four times, all in the context of them demanding that he accept that he lacked basic competencies and him expressing his reluctance to do so. And saying, if what you're telling me is you don't want me here, let's work out some separation. And this is after leading this company on the road. What is the, what is your, do you have a comparator here? The comparator is Mr. Malzberg. In this sense, in terms of the assessment process, yeah, if you put the documents side by side, I just suggested some, the 733 and 2300, for example, you can see they're doing these comparisons. Those are the only two who are attested that way in this process. And then it's, but here's the question, Your Honor, is that if he, if it was offensive for him to bring up severance as a way of resolving this dispute in April, why was he fired in October? Why wait? What justified, what sort of transgression did he do to bring on termination? And there's nothing in the record. The justification that the court accepted and put in its order was that it would be awkward to have him before the board because I'd already told the board I thought I had reservations about his engagement. But that report to the board in August came at the same time that Dr. Rivers, the consultant, explained that all of their efforts to revise this assessment process had not changed her assessment of these two men and that Jones remained the more capable successor. So then we get to this critical meeting, series of meetings in October, which is what leads to the termination. Dr. Rivers comes on October 17th, and she brings with her, her report to the board, and here the court gets this wrong. Why is this? Why is this anything other than an assessment of Maltzberger and Jones? And who's going to make the best successor to Niblack? Why isn't this just what companies do all the time, which is to weigh the relative merits, which involves certain objective and but also certain subjective components, and decide who is best qualified to lead the company when one individual steps down. And it seems that for a long time, Mr. Niblack was grooming Jones for the position and he was going to be the drop dead successor. Actually, that's disputed, Your Honor. I will. It's important to understand that that is. I'm asking, reading the record here, it seemed to me that Jones was being groomed and for a long time he had the inside track. And I don't understand why this is necessarily racial discrimination as opposed to just looking at two people and deciding that one is more suitable for the company's needs. Your Honor, don't be confused here. The racial discrimination issue in the case is determination. And the import of the assessment is, it is the sort of thing that happens all the time. Although, Furloughs had never done this before. They never brought in an outside consultant because it had always been the prerogative of the CEO. And it's very disputed that Mr. Jones' testimony is that it was clear that Mr. Niblack favored Mr. Malzberger to be his successor all the way along. And Ms. Weber described that he had a clear affinity for Malzberger in going through this assessment process with him. The issue is that he fires him and then he and Weber dramatically modified Dr. Weber's assessment of Malzberger to whitewash it. It completely contrived and played. If you look at the document, here's the comparison. I was trying to get to this. On October 16th, she brings her report. October 17th, rather. She brings her report at 2248 of the record. And it's not this assessment of every executive. It's Malzberger and Jones, and they brought in a third McDermott. And they are ranked on graphs.  It's a comparison. But the whole thing has backfired because she rates Jones and Malzberger both as very high risk now because of all this kind of controversy, I guess. But the summary assessment of Jones is still extremely positive. And the summary assessment of Malzberger is very, very negative in parts, that he has fundamental problems as a leader of people. I mean, maybe so, maybe not. But when Malzberger looked to have the inside track, wasn't it at that point that Mr. Jones became disengaged and even to the point of cleaning out his office? Because this is the kind of thing that happens a good deal of the time, that you have two people who are in the running for the top position at a particular company, and it becomes clear that one of them is going to get the position. And then the one who is not going to get the position loses interest because his goal and ambition is not going to be fulfilled. And so the person who — Your Honor, if I may — — just doesn't put the same amount into the job and is just marking time. Your Honor, the jury could believe in this case that that simply did not happen. In this case, was there not an objective manifestation of marking time when he cleaned out his office? Can I respond to that, Your Honor? If somebody cleans out their office, somebody who worked for me or worked in a company where I was working, if they cleaned out their office, it would communicate to me, well, they don't much care. If they're not all in. The record is a little different here on this. What the record shows is that Mr. Jones moved some of the things in his cabinets out because he had been threatened with termination if he did not accept that he couldn't — these invalid competency ratings that Mr. Nivak later agreed were not valid scores. His version of the reason for packing up is that he thought he was about to be fired. And he was asking for severance rather than be fired. And that's the reason. And that's the issue. He doesn't get fired for five more months. And there's no manifestation of disengagement from that encounter in April and May to October where he's doing everything that he had been doing. He's the one who's making money for the company. Mr. Malzberger's division is in the red. Every aspect of what he's doing. The person who's carrying the load at Lowe's is Mr. Jones. And the issue here isn't — a jury could disbelieve that he became disengaged and could find that this — as the district court reacted when it saw this unexplained change in the assessment document and asked — it ruled that a jury could disbelieve the disengagement issue and then turned around and said because there was no promotion out of the assessment, that dishonesty in the process was immaterial. That's the legal issue. One of the legal issues in this case. The jury could disbelieve disengagement and find dishonesty. Thank you. As a matter of business practice, if, as you say, one individual is producing a lot of profits and one individual is running a loss, I mean, why would a company fire the individual who is producing the profits? I mean, it doesn't make — if it's as clear-cut as you say, it doesn't make sense to me because the businesses are attuned to the bottom line. And I don't understand the — Well, your Honor — I would make sense to dismiss — It's hard to — I don't mean to be interrupting you. It's hard to do it over the phone like this. But here's a piece of evidence that you really need to see just because it answers your question. Racist — race discrimination is irrational. It doesn't make sense. But on May 17th of 2016, for the first time in seven years, since 2009, Lowe's beat Home Depot in a quarter on comparable sales, for the first time in seven years. That same week, Mr. Niblock and Ms. Weber rewrote the CEO profile to move profitability down to second in priorities of the company and moved some of Mr. Maltzberger's skills or visionary stuff about, you know, omnichannel stuff and all the, you know, ways of reaching customers. And he said that was a higher calling than making a profit. That's irrational. You just said it was. And that's at the heart of the sort of bizarreness of this process. They were deliberately dishonest for whatever reason so that Mr. Maltzberger would come out ahead in this process because that's the end that Niblock wanted. And when he couldn't get it — Why is this a matter of race rather than just human chemistry? Well, at this point — Sometimes people have good chemistry and sometimes they don't. And that happens within a company. And why is this a matter of racial discrimination as opposed to just a matter of who gets along with whom? Well, that's not — that's the issue for trial, Your Honor, whether this is race or something else. But we get to trial because the jury could disbelieve the disengagement claim and could find evidence of duplicity and mendacity in the way they handled the assessment. And that, under all of your case law, from St. Mary's Honor Center down, that's how you get to trial. If the jury can disbelieve the justification here that he became disengaged and finds evidence of dishonesty, particularly if they can find that, then you get to trial. And at the trial, we figure out whether this is just chemistry between people or whether the jury decides this is, in fact, race discrimination. And that's all we're asking, that we should have a trial about that question. All right. I'm going to ask if any of my colleagues have any questions for you. Judge Floyd? No, sir. Judge Grove? Yes, sir. Counsel, you agree there is a categorical difference between favoring one person over another simply because of the chemistry and favoring one person over another because of race, correct? Well, it's sometimes a subtle categorical difference, and that's the question. That would be the question in this case, and that's the question in every race discrimination case. Was there something other than race that was driving the differential treatment, or was it more likely than not race a factor? I had some trouble in reviewing your brief finding concrete examples of discrimination. Can you point to one or a few for me? Well, one would be what I was trying to explain at the end. After he's fired, that he knows of two white executives who did not qualify, who did not qualify for their stock when they were separated from the company during his tenure. And they got their stock through a special request by the board or a special dispensation. And he asked for the same when he's let go, and they do a public pillory of him that he's greedy. He was being treated completely differently than two white executives as that instance. But again, the question here is under the framework, Your Honor, the question isn't having to prove race. It's having to show that the jury would disbelieve the justification. And that enough, that's enough to get to trial. But especially if on top of that, there's evidence of dishonesty in the way that they handled this matter. And Judge Bell correctly reacted in court when he saw this dramatic alteration of the work that Rivers had done, taking away every criticism that she had of Malzberger and whitewashing it. This would be like an employee being fired for taking issue with some aspect of a personnel evaluation. And then the black employee and then the white employee not only doesn't get fired, but all of the criticisms in his evaluation get removed. That's what happened here. And it doesn't make any sense. And race is the best, at least is an explanation of that. And under the rubric, we don't have to. There is stuff in the record about their interactions in some way. There's a lot of racial issues at the company. But that's not. I'm not sure whether it's a question for trial or not. But the question is whether this is just a judgment on the part of the company. The one person is better suited for the long range needs of the company than someone else. I mean. Well, but what you have here, Judge, is an outside person saying that Mr. Jones is far superiorly suited and Mr. Niblock tries to undercut that. That's the issue related to the assessment. It's him going against the outside. What I'm asking you is every time two individuals are compared for their suitability for a particular position, it doesn't necessarily create an issue of triable fact. But that's not the issue. That's what it is. At any rate, we've given you a good amount of time. Yeah, I appreciate that. Have some rebuttal time. I think it's. If I could just say this, Your Honor. The issue is that we're not claiming race discrimination in the assessment. We're claiming race discrimination in the termination in the assessment. All right. I understand you. OK. Thank you. Thank you, Mr. Larges. Mr. Raphael, let's hear your view of it. Thank you, Judge Wilkinson. May it please the court. Stuart Raphael for Lowe's Companies. The district court correctly granted summary judgment to Lowe's on the race discrimination claims. And there's no dispute that the analysis is the same under both Section 1981 and North Carolina law. Judge Bell correctly granted summary judgment because the plaintiff failed to adduce sufficient evidence on either. Number one, that Niblack stated reason for Jones termination was untrue or that the real reason was because Jones is African-American. At the third third step of the McDonnell Douglas test and under this court's decisions in cases like guesses, once Lowe's proffered a nondiscriminatory reason for the termination, the burden shifted back to Jones to prove, number one, that the stated reason for the adverse action was untrue and was a pretext. And number two, that the true reason was discriminatory. And those two embedded elements are key. Since the briefing in this case, and we did drop a footnote and file a Rule 28 jail letter about this, the Supreme Court decided the Comcast decision. And that case holds that but for causation is required to prevail in the Section 1981 case. And that makes 1981 different from other statutes like you, Sarah, and Title seven, which allow a motivating factor analysis. So I think the question at the end of the day for the court and for Mr. Largess is where in the record is there any evidence to show that but for Mr. Jones's race, he would not have been fired. And the answer is simply there is no evidence to show that. I want to start with the evidence that corroborates the nondiscriminatory reason for his termination. He had become disengaged and cleaned out of his office. There are seven examples from the record that I think corroborate that. Number one, it's undisputed that Jones began looking for jobs, working on his resume as early as January 4, 2016. That's before the Hay assessment even took place. He emailed a resume writer saying that it was now time for him to start looking at jobs at Fortune 500 companies in a CEO position. That's at page 460 of the record. And remember that there was no question at this time that there was no plan for Niblack to leave as the CEO of Lowe's. He was expected to be there for another three to five years at least. Number two, it's undisputed that the very next day after Jones sent that email to a resume writer, he wrote himself a note. And this is at page 463 of the joint appendix. The note was talking about what was working for Lowe's economically. He said it was long-term growth and short-term profitability. But then he's talking about leaving. He says, my timeline, this quote, my timeline is too short to spend three to five years waiting for the business to figure this out, unquote. And we detail in our brief the various job efforts he made to find another job at other companies. Number three, it's undisputed that Jones repeatedly suggested to both Niblack and other senior executives that he be given a separation package so he could, quote, move on. That's at pages, for example, 255 and 1767 of the joint appendix. That clearly shows disengagement. Number four, to Judge Wilkinson's point, it's undisputed that Jones cleaned out his office acting like he was going to be let go. He testified that he thought he was going to be let go. And imagine the effect that that has on the morale of others. That's a clear corroboration of disengagement. And Jones admits at page 256 that Niblack told him he was acting childishly by cleaning out his office in the view of other employees. Fifth point, it's undisputed that Human Resources Vice President Andrew Ellis told Niblack a week before Niblack terminated Jones that Ellis thought that Jones had become disengaged and should be let go, that he had checked out from his job. That's a quote from Mr. Ellis. That's at page 466, paragraph 9. Now, Mr. Jones suggests in his reply brief at page 15 that this fact is contested, but it is not. He contests a different fact about a conversation between Ellis and Jones that took place after Jones was fired. We described this disagreement at footnote three of our brief, and we're not relying on that because that fact is disputed. But it's undisputed that Ellis told Niblack a week before he fired Jones that he thought Jones should go, even though Ellis had previously supported him and thought he was a really great employee. Number six, it's undisputed that board members in August of 2016 noted the negative changes in Jones's behavior and asked Niblack about it. That's at page 1768 and 2193 of the joint appendix. And lastly, last point I'd make, Niblack testified without contradiction that he perceived Jones to be less engaged. And he cited as an example Jones leaving early from a key customer meeting in Charlotte. That's at page 1767 of the joint appendix. And there's no response by Mr. Jones to that fact in his brief. He wants to say, well, Jones kept coming to work and all that, but we're not saying he stopped working. We're saying that Niblack perceived him to be disengaged, and that's fully corroborated by the record. Moreover, this is not a case where the employer's reason changes or is based on post-hoc rationales. Niblack's stated reason has been consistent throughout the case. So this case is governed by cases like Sheriff from 2016, where the court cited the employer's consistent reasons for why summer judgment was appropriate. And this case is therefore distinguishable from cases like Jacobs from 2015 that Mr. Largesse relied on in his opening brief, where the reasons given by the employer weren't given at the time, changed consistently, and there was significant evidence that the employer was making up reasons for what was a discriminatory discharge. The court in Lovett versus Cracker Barrel distinguished Jacobs as not applying, where you have a consistent reason given by the employer and the reasons are corroborated in the record. Now, let me turn to the other aspect of the analysis, and that is, where is the evidence of racial animus, or that the stated reason was a pretext for discrimination on the basis of race? There was zero evidence presented to show this. Jones also failed to overcome the same actor inference that the person who had previously promoted him, and Judge Wilkinson, you're exactly right, Niblack was grooming Jones to be a successor. There is ample evidence to show that. I need to make a few corrections in my friend's statements in his reply brief. He says at page four of the reply brief that Niblack was not the one who actually promoted Jones to the chief customer officer position. He claims that fact is disputed. That is simply untrue. Bridgeford, who occupied that position, he testified that while he had recommended Jones, Niblack was the one who actually appointed him because Jones reported to Niblack. That's at page 443 of the joint appendix. Bridgeford also testified that while he was the one who initially hired Jones in 2013, he made sure that he had Niblack's approval to do so. That's at page 443. And Jones admitted that he knew that Niblack had approved him. That's at page 1412. Mr. Largesse is not correct that Jones was the first African-American to report to Niblack. He was the second. That's at page 56 of the joint appendix. The current CEO, incidentally, of Lowe's is African-American. That's at page 184. And Malzberger, who Mr. Largesse talks about, he never succeeded. He did not succeed Niblack as the CEO. He is no longer at the company. Second point on the racial animus piece is that Niblack did not recommend the plaintiff claims that Niblack did not recommend Jones as his hit by the bus successor in 2015. Obviously, this is a key issue because it goes to the idea that Niblack was very supportive of Jones, and it's very unlikely that he would then turn around and want him fired. But the evidence that Niblack recommended Jones as his hit by the bus successor is undisputed. It's at page 1706 and 1707 of the joint appendix and at page 2652. Niblack testified that he did recommend Jones in 2015 as his hit by the bus successor. Board member Morgan corroborated that at page 2793 of the joint appendix. And this is actually quite an interesting point. We're talking about August of 2015. At that time, the board understood that the long-term prospects for successes for Niblack were Malzberger and Jones. And you'll see that chart at page 2624 talking about them as possible long-term successors. So at the very time that the board understands that Jones and Malzberger are the potential long-term successors, Niblack is saying, if I'm hit by a bus, I want Jones to succeed me. I mean, that I think really demonstrates Judge Wilkinson's observation that that Niblack really was grooming Jones to be the long-term successor. And their evidence. What caused the falling out? Your Honor, what we think happened was Jones saw that Niblack was not leaving. He, beginning in January of 2016, started to look for other jobs. He overreacted to the Hay Group assessment, which was overwhelmingly positive there. But as in any leadership assessment, there were some constructive criticisms in there. He completely overreacted to them. He talks about the Hay assessment as if there was something that said he was a terrible leader. But Mr. Largest doesn't even tell you where that is in the assessment. Right. He just completely overreacted to it. He became petulant about it. And at the same time, he was looking for other jobs. So it just it's a really unfortunate thing that that happened. But this was not Lowe's doing. And the fact that Niblack gave him an opportunity to do better. Mr. Largest tries to make an issue out of the timing there. But Niblack, the cleaning out of the office incident reflected childish behavior by Jones. That was in June and July of 2016. And Niblack is trying to give him a chance. He tells him, you know, you've got to get your head in the game. We want you as a member of the team. And things just didn't improve. And that's why Niblack ultimately terminated him. Further to that point, it's undisputed that Niblack gave Jones a glowing performance review in February 2016. This is before the Hay group assessment came back that February 2016 reviews at page 650 of the joint appendix. And he also gave Jones glowing reviews as part of the Hay assessment itself. Those his comments are found at pages 11, 11 and 11, 12 of the joint appendix. So. So getting back to the same actor inference, which dates to your honor's decision in Proud. This is a classic case for applying the same actor inference. The main argument against it is is the largest as well. Proud involved a six month period. And here you have a 30 month period or longer. But this court's on bank decision in Taylor involved a 27 month period. The employee there was hired in August in August of 92 and fired in November of 94. Twenty seven months later, you have a 30 month period here. So it's very comparable to the period in Taylor. And during that time. And I'm starting that I'm running that time from the time Niblack appointed Jones as the chief customer officer in April 2014. He ultimately terminated him in October 2016. That's 30 months later. But in the interim, he's he's designating him, appointing him, recommending him as his hit by the bus successor. He's giving him glowing performance reviews in February and April of 2016. And he terminates him in October 2016 after the petulant reaction he had to the to the Hay group assessment. And he didn't get his head back in the game. So this is clearly an appropriate case for applying the same actor in inference. And Mr. Largess has no explanation why Mr. Niblack would have turned around and fired him after having promoted him so much. He tries to generate a factual dispute out of the idea that the board didn't accept Niblack's recommendation that Jones should be the hit by the bus successor. But when you look at Morgan's explanation for why that was, it was because the board understood that Malzberger and Jones were the two likely successors. And they didn't want to pick Jones and create ill will with Malzberger. That's a page twenty seven, ninety three and ninety four of the joint appendix. But what it shows is is Niblack is very supportive of Jones, not the picture that Mr. Largess is trying to paint. The only time that the plaintiff came close to suggesting anything relating to racial animus is not even argued in the reply brief or and I think has been dropped. But I for fear that it may come up in the in rebuttal argument, I do want to touch on it. And we address this in our opening, in our in our brief. There were alleged stray remarks by Niblack referring to the show Blackish and referring to the Donald, you know, when Donald builds, builds the wall comment. They're mentioned obliquely in this in the statement of facts in the opening brief. We pointed out in our appellee's brief that that argument was not made below on the motion for summary judgment. And it was not contained in the argument section of the opening brief and is therefore waived. And Mr. Largess dropped it in his reply brief. But I just want to make it clear that those those remarks, which which don't even connect to any action by Niblack, are not proper in the case. And sometimes, you know, sometimes falling outs just just happen. I mean, they're they're unfortunate. But, you know, it can it's often just when when two people get along or when two people don't get along or whatever, that happens for many different reasons. And it isn't necessarily something that relates to race. It's just that people get along and sometimes people don't get along. And, you know, just looking at the record, I'm just wondering that that seems to be what's going on, what's going on here. There was for the longest amount of time a very laudable attempt to give Mr. Jones a very meaningful role in the company. And that that was a good thing. And, you know, he was given a good chance. For one, I'm sorry it didn't work out. But, you know, I'm sorry things fell apart for whatever reason. But just doesn't find it hard to attribute it to race and the sense of creating a tribal issue on that point. I wanted to ask you. There was also a defamation claim in this case. And I noted with some interest that our esteemed friend and colleague Judge Wynn on the North Carolina Court of Appeals wrote a good opinion saying that a negative assessment of an employee is not defamatory under North Carolina law. And Lowe's was simply exercising a right also to reply when Jones assailed the reputation of the company. But anyway, didn't the defamation claim seems to fall for a number of reasons that a lot of the a lot of the statements were either statements of opinion or they were absolutely true and not a category is is is actionable. Yes, Your Honor, I think that's exactly right. If you if the court affirms on the that there was no Section 91 discrimination, I think the defamation claim does fall in response to your observations. You're exactly right. North Carolina law. And I like you, Judge Wilkins. I come from, you know, grew up in Virginia under Virginia law. I was quite surprised to see how how clearly North Carolina law prohibits a defamation per se claim based on a statement that an employee was dishonest or untruthful or unreliable. And Judge Wynn's opinion and losing versus food lines, an excellent example of that. Mr. Largesse argues in his reply brief that North Carolina law distinguishes between libel and slander in that regard. And somehow that distinction doesn't apply to libel claims. That's just not true. And the three North Carolina district court cases that we cite in footnote 15 of our brief are examples of libel claims where the court said North Carolina law doesn't provide a defamation per se claim based on calling an employee untruthful or unreliable. Anything further, Mr. Raphael? Yes, Your Honor. The one thing in this case that might that would warrant publication, I think, is on the qualified privilege of reply under Fortich, because here you had a very reputable company assailed in by a television news station about being engaged in race discrimination. And it simply defended itself by putting out a statement at page 508 of why it didn't discriminate against Mr. Jones on the basis of race. That is plainly covered within the privilege of reply. And I think I think the court would do right. You've covered that in your brief. Yes, Your Honor. So we would ask the court to affirm on the basis of the 41 page opinion by Judge Bell that that was exactly right on the law. Thank you, Your Honor. Wait a minute. Hold on, Judge Floyd. Did you have any questions? No, sir. Judge Groh, do you have any questions of Mr. Raphael? No, sir. All right. We thank you very much, Mr. Raphael. And I want to make sure that Mr. Largess gets in his time for rebuttal. Mr. Largess, we are happy to hear from you in rebuttal. Thank you, Your Honor. Let me start with a few things. First of all, it is not the case under the law that we have to prove that race was a factor at this stage. We have to only prove at this stage that a jury could disbelieve the evidence, the claim of disengagement and find some mendacity in the way the matter was handled. This case went off the rails, as you say, Your Honor, very obviously. And it's at the document. You said you didn't point to it, but the document of this sort of competencies is at page 734 for Mr. Jones and 2302 for Mr. Maltzberger. It's the only aspect of the assessment where Mr. Maltzberger scored ahead. And the issue isn't whether Mr. Jones, the question is whether Mr. Jones was petulant at being told he couldn't do those basic things, couldn't lead a senior team, he got a zero, or whether he was threatened with termination if he didn't accept it. In his evidence, which a jury could believe, is that he was threatened. And that's why he had the reaction he did to the process, not out of some sort of childishness, but out of the very — on April 22nd, the second-ranking Black employee in the company, the former HR second — the second-ranking HR, was fired precipitously seven weeks after Ms. Weber came aboard. And that's why she came in and said to him, Are you ready now to accept the competencies? Whether you think you're going to be terminated or not, if you are, there's plenty of time after you've been terminated when you can clean out your office. But to be cleaning out your office while you're still on the company's payroll, that seems to me to send a pretty clear signal that you're not engaged or that you've just given up on whatever relationship you had with the company. And Mr. Raphael made the point — Your Honor, if I may — Could I just — could I please ask — Go ahead. I'm sorry. I would think it would be extremely demoralizing to be working next to someone or across the hall from someone and find that they've just cleaned out their office. It's got to — it gins up rumors, number one. And you don't want to — you know, everybody's trying hard to make the company work. And you don't want one person in the company who had held or continued to held a very senior and responsible management job to just say, I'm out of here or to clean out the office. It's almost a symbol of cutting ties. May I respond, Your Honor? That part of it really bothered me. I understand. And again, two things. One is that what Mr. Jones did is he had brought a bunch of stuff with him from Husqvarna and GE, his prior work, that were in cabinets out of view anyway. And he cleaned out those cabinets because he thought that if he was going to be fired, he would be walked out, just like he was walked out the day he was fired. And he wanted to be able to carry all of the things in a box so that he could be on his way. He thought he was going to be fired in days, Your Honor, at the time that he did that. And what he did in response was he went to Boston the next week and gave a glowing report on Lowe's future to a group of investors who wrote a letter back saying it was the best presentation at the session. He wrote to his team about doing this campaign with Walgreens to look at cost-cutting measures. He went and traveled to stores and met with store managers and assistant managers and got reports back that in the 16 years with Lowe's, they'd never seen anything like it. The evidence is that he was completely engaged and professional, trying to figure out how to navigate this unexpected development where he was being told that in this process, he had to accept that he couldn't lead people. And he had reluctance about that. And the question is whether he acted as he did because he was threatened or because he was immature. And you seem to be taking the position that as a matter of fact, him doing that is proof of disengagement when it's proof of fear that he's being terminated. And that for the five months after that, that was in May, not in June and July. That was in May. And from then until October, the only thing identified in the record as a concern were two things. One is that he left one meeting early and that he had to be reminded to come to another meeting in five months. So there is a record here where a jury could just disbelieve that it's too convenient to have this disengagement issue. And that because Mr. Niblock was cynical in putting this competency thing for him and making it the linchpin of this succession process. Well, the point I think is or one point is that when normally you have a question of protectuality, it's sort of shifting here and there and all over the place. And you have explanations that are inconsistent and are in fact at odds with one another. But here it does seem to me that there's a certain consistency in the explanation, which is that he's become disengaged. And I don't think they really put forward anything else. And you have all the members of the Board of Management indicating that in their view, their perception, he was disengaged. And then you have a certain corroboration, even though I understand the company wasn't aware of this right at the time, but that he was actively hunting for new jobs. And at some point, you know, at some point, all of these little pieces begin to add up to a picture of someone who was in fact disengaged. And if you had another explanation or if the company's explanations were shifting or furtive or whatever, then I think you'd have an issue of tribal fact. But I'm just not sure on this record that you do. But Your Honor, what you just said, there is no board member who testified that they had concerns. Mr. Niblock testified that board members said things to him. But the only evidence in the record is in August out of the blue, he sends for the first time an email saying that he has some concerns about Jones' level of engagement. And that is right at the same time that Dr. Rivers has come back and said that her assessment, Jones is still the superior candidate, even though they've tried to rewrite the profile. And it's that that leads to his termination. And then the revision of Malzberger's assessment, it's rank dishonesty combined with the jury's ability to objectively, objectively, Your Honor, again, the only criticism Mr. Niblock had was that he missed a meeting or left a meeting early once in five months. If you look at 20, let me find this page, 2775 of the record, which are the notes about the interview of Mr. Malzberger when they reopened the assessment. Look at the last page. Mr. Malzberger was missing CEO staff meetings, sending a message that he doesn't need to be there. Everyone else goes. So they're firing him because he left one meeting early and had to be reminded to attend another. But Mr. Malzberger, who has all criticisms wiped clean of his assessment, is not going to regular staff meetings. That's disengagement. And there are other people in those same pages saying that he doesn't show up. He's never here. Why is he away so much? Mr. Jones is the one who was keeping this company on course during all this time when he's being demanded to accept that he can't lead people. And he just walked with doing that. And he did not interview with anyone until after all that, Your Honor. And his only reason in January for putting a feeler out to have his resume was he anticipated exactly what was going to happen here, that this process was going to be used against him. And it's the dishonesty in that process and the fact that objectively he continued to produce and keep the company's ship steaming. He's the one who's motivating people going around and leading these programs. On the day he's fired are all his notes from meetings the day before on short and long-range planning. He has been still completely engaged in trying to be professional. And Mr. Raphael raises this thing about blackish, but that was in the record. But the more important thing that was in this brief is in August he went to human resources and complained that they were running all the black HR executives out of the company and that there was a concern about racial issues in the company. That is right at the time when he sends his note to jump to the board saying he has some concerns about his level of engagement. All right. Thank you. Thank you very much, Mr. Largess. Thank you. Appreciate your argument. And I want to say both to you and Mr. Raphael, again, as I've said at the earlier cases, I'm really sorry that the coronavirus prevents us from coming down and shaking hands with you personally and and thanking you. I thought I thought on both sides that this these arguments were very well presented. And and so on behalf of the panel, I'd like to thank you both. And I'm going to ask at this point that the courtroom deputy adjourn adjourn court and then put us into a conference setting. Thank you. Thank you. The court stands adjourned until tomorrow. I'm sorry. Until this afternoon. God save the United States and the court.
judges: J. Harvie Wilkinson III, Henry F. Floyd, Gina M. Groh